JOE MALLETT ET AL *v.* SARA BRANNON ET AL

5-4439                                      423 S. W. 2d 880

Opinion delivered January 22, 1968
[Rehearing denied March 4, 1968]

*Douglas Bradley,* for appellants.

*Gordon & Gordon,* for appellees.

CARLETON HARRIS, Chief Justice. On March 22, 1966, Mrs. Sara Brannon, age 30, appellee herein, was operating a 1956 Chevrolet automobile, which was owned

by her husband, Earnest Dean Brannon, within the city limits of Morrilton. Occupying the vehicle with appellee were her three small children. Mrs. Brannon was traveling west on Highway 64, and she stopped her automobile at the intersection of Cherokee Street. According to her subsequent testimony, it was her intention to turn left, and she signaled such a turn with her blinker light. Joe Mallett, driver of a Save-A-Stop, Inc., tractor and trailer unit, was likewise traveling west behind Mrs. Brannon, and struck the rear of the Brannon vehicle. Appellee received personal injuries, and thereafter, she instituted suit for damages purportedly suffered. Her husband, individually, and as father and next friend of the minor children, likewise joined in the complaint, seeking recovery for the damage to his automobile, the loss of companionship and consortium of his wife, recovery for the injuries to the children, and judgment for the medical, hospital, and other bills allegedly occasioned by the collision. On trial, the jury returned a verdict for Mrs. Brannon in the amount of $30,000.00, and found for Mr. Brannon in the amount of $2,000.00. The $2,000.00 judgment was paid, but Mallett and Save-A-Stop have appealed from the judgment entered against them for the benefit of Mrs. Brannon. For reversal, six points are relied upon, but under the view that we take, there is no necessity to discuss all of these contentions.

The proof on the part of appellee reflected that she was on her way to her mother's home somewhere in the neighborhood of 5:00 o'clock P.M. She stated that she traveled west on Highway 64 with the intention of turning left into Cherokee Street, and that she turned on the blinker at the intersection for the purpose of allowing eastbound traffic to clear before making her turn. While waiting, she was struck by the vehicle driven by Mr. Mallett. Appellants readily admit the negligence of Joe Mallett, which is imputed to appellant, Save-A-Stop; however, appellants point out that such an admission is not intended to absolve the appellee of negligence, and it is contended that she was likewise guilty of negligence.

It is urged that the court erred in permitting the testimony of A. A. Davis, who operates a grocery and furniture business on Highway 64. Mr. Davis, whose store is about a half block from the intersection, testified that he heard the crash, and he immediately went outside, and noticed that the left blinker light on the Brannon automobile was blinking. Appellant argues that since Mr. Davis did not see the collision, this testimony should not have been allowed. Appellant argues that the fact that the light was on after the collision was not proof that it was on before the collision, and that this testimony permitted the jury to speculate that the light was on. We are not impressed by this argument. The testimony by Davis was to the effect that he *immediately* ran out of his store upon hearing the crash, and noticed the blinking light. We think this was a circumstance that the jury was entitled to consider in reaching its conclusions.

It is asserted that the court erred in permitting Dr. T. H. Hickey of Morrilton to express an opinion based on, according to appellant, a deficient hypothetical question. The question was rather lengthy, and was based on the testimony presented by appellee and her witnesses. In propounding same, counsel for appellee asked the doctor to assume that the weight of the tractor-trailer which struck appellee's car was approximately 12,000 pounds; that the empty weight of the trailer was approximately 10,000 pounds, but carrying a load of approximately 2,000 to 2,500 pounds, and that the blow pushed the vehicle of Mrs. Brannon (who had her foot on the brake) approximately 73 feet. Her immediate symptoms of injuries were then described and Dr. Hickey was asked if he could state whether or not, with a reasonable degree of certainty, that this collision was a competent producing cause of Mrs. Brannon's pain and disability. Counsel for appellants objected on the basis of the fact that there was no evidence as to the speed of the tractor, the doctor having stated that weight and

speed produce force. Of course, there would be a difference in the result where a vehicle traveling 20 miles an hour struck an object, and where one traveling 60 miles an hour struck the same object, though it was undoubtedly appellee's idea that the distance an object travels after being hit (the distance being disputed) is itself an indication of the force (and therefore, indirectly, the speed) of the blow. There being no testimony as to speed, that factor could not properly be used in propounding the hypothetical question, but this does not mean that such a question could not be asked. In *Missouri-Pacific Railroad Company* v. *Hampton*, 195 Ark. 335, 112 S. W. 2d 428, this court, quoting earlier Arkansas cases, said:

" In taking the opinion of experts, either party may assume as proved all facts which the evidence tends to prove. The party desiring opinion evidence from experts may elicit such opinion upon the whole evidence or any part thereof, and it is not necessary that the facts stated, as established by the evidence, should be uncontroverted. Either party may state the facts which he claims the evidence shows, and the question will not be defective if there be any evidence tending to prove such facts."

Further, quoting yet another case, the court added:

"In propounding a hypothetical question to an expert witness, the data upon which it is based need not cover all of the facts which have been proved in the case. The party offering the testimony may select such facts as he conceives to have been proved, and predicate his hypothetical question thereon."

It was also stated:

" * * * Besides, if appellants' counsel thought there were any facts omitted from the question which were essential to forming a conclusion, his remedy is to put those additional facts before the witness on cross-examination."

Here, no cross-examination relative to the basis of the answer given by the doctor was conducted; in fact, there was no cross-examination concerning the hypothetical question at all. We find no merit in this contention.

Appellants' primary point for reversal is the assertion that the court erred in denying appellants' motion to require a further medical examination of Mrs. Brannon. The factual background giving rise to this point is as follows:

Appellee's medical witness was Dr. Hickey, who, on February 20, directed a letter to counsel for appellee which states:

"To Whom It May Concern:

Re: Mrs. Sarah Brannon

This patient was seen at St. Anthony's Hospital on March 22, 1966. She complained of some pain and soreness in the region of her neck and head, with some pain and discomfort in the region of the anterior chest wall. According to the history from the patient, she had just been in an automobile accident in which the car she was driving was struck from behind and knocked some distance. She remained at St. Anthony's Hospital and was dismissed on April 3, 1966. The pain and soreness in the region of the cervical spine, dorsal spine and anterior chest wall, and the headaches became more severe. She has had almost continual pain in this region since this accident. X-rays were negative for fracture or dislocation. She has been treated with analgesics, sedatives, muscular relaxing drugs, and ACTH, and with a cervical collar. It is my opinion that this patient will have approximately 10% to 15% permanent partial disability in the region of the cervical spine as a result of this accident."

Copy of this letter was turned over to counsel for appellants. Appellants had previously requested an ex-

amination of Mrs. Brannon by Dr. J. J. Magie, a Morrilton physician, and she voluntarily submitted to an examination by this doctor on February 27. Magie's report was submitted to counsel on March 1, and the portion pertinent to this point reads as follows:

"Upon examination of the sensory system there was noted to be complete anesthesia to sharp pin point sticks of the skin involving in an area involving the left upper extremity, left haemothorax, left neck and left face. The patient is unable to distinguish between dull and sharp pin points in these areas. There appears to be loss of position sense of the sensory system involving the left upper extremity. There seems to be some weakness of trapezius power on the left. The bulk of the muscle appears to be intact as there is no atrophy. The power hand grip is negative. Abduction and adduction of the fingers were normal. Extension and reflexion of the forearm were normal but seem to be weak. The muscle bulk and tone appear to be normal. The reflexes of the upper extremity tricepts, bicepts and brachoradialis were normal. The occumen were positive on the right side. The lower extremities appear to be intact.

"It is thought that this patient contains quite bizarre neurological findings that are difficult to evaluate. It is suggested that this patient be examined by a neurologist for completion of diagnosis. It does appear that this patient has suffered some cervical neck injury. This is demonstrated by weakness of the left upper extremity, weakness of trapezius function and loss of ability to completely flex the neck.'"

---

[1]With reference to neurological findings, Dr. Magie, at the trial, testified:

"Well, this was what was quite interesting with this woman, and this woman presents a picture of having, and she states that she has in her history, some loss of anasethia of the left hand; and when I checked her for sensory sensation, this woman has loss —it's subjectively shown—that she has loss of sensation of the left upper arm, the upper half of the left thorax and of the face. She has a positive Hoffman sign of the right hand, which probably means nothing really. This is—Can I give my interpretation of this?

This 'was appellants' first information concerning any nerve damage, and a motion was filed asking that Mrs. Brannon submit to further medical examination under the rules of discovery. A copy of Dr. Magie's findings was attached to the motion. The court, on March 6, denied this motion.

Mrs. Brannon, *inter alia,* testified as to a loss of feeling in her left shoulder and left arm, and Dr. Hickey also testified to these facts on his direct examination. The doctor admitted on cross-examination that he had not mentioned in his letter of February 20 (heretofore set out) any loss of feeling, but stated that, in the letter, he was just giving a "summary" of his findings. Dr. Hickey agreed that a neurologist would be more likely to find nerve damage than the normal practitioner. The doctor had stated on direct examination that he had sent Mrs. Brannon to see Dr. John Adametz, a neurosurgeon of Little Rock, testifying that he made this appointment for appellee as a matter of determining that she had no brain damage. There is no report from Dr. Adametz in the record, nor did he testify at the trial,

---

"This is quite a bizarre finding—I'm sorry—One other thing is that this woman has loss of positional sense of the left upper arm, and what I mean by that is that I can bend her fingers like this and have her close her eyes and ask her which position her finger is in, and she can't tell me whether it's straight or whether it's flexed. And these findings—loss of sensation of the chest—the skin covering the chest—the arm and the face and the positive Hoffman and loss of positional sense is quite a bizarre array of symptoms, and it's hard to explain these symptoms, or these signs on the basis of her injury."
Q. "Doctor, you might tell me what you mean by bizarre?"
A. "Well, it doesn't fit completely."
Q. "All right. In lay language then I assume then—or can I assume that you are saying you cannot relate these complaints to a history of whip lash?"
A. "That's right. * * *
"The left side of the neck, the left arm, and the left thoracic cage is supplied by the sensory nerves from the cervical spine— here. The left face is supplied by a cranial nerve, which has nothing to do with the cervical nerves in the neck. This is why this thing seems quiet bizarre, how this woman with a neck injury could have involvement of the left face, loss of sensation to touch and pain over the left side of her face. This is why, to me, it just doesn't fit. I couldn't explain it."

and appellants obtained the first knowledge of appellee's visit to this neurosurgeon during Dr. Hickey's testimony.

Appellants argue that they had no way of knowing, when selecting Dr. Magie, that an examination by a neurologist was desirable, since the doctor had been selected before they received the report from Dr. Hickey, and —what is more important—nothing is mentioned in the Hickey report that they received concerning nerve damage.

We think there is merit in appellants' contention; of course, as stated in *Reed* v. *Marley*, 230 Ark. 135, 321 S. W. 2d 193, the statute, Ark. Stat. Ann. § 28-357 (a) (Repl. 1962), does not give an absolute right to a defendant to have the complaining party examined by a physician of its choice, but does authorize such an examination "for good cause shown."

We think good cause was shown. These alleged injuries certainly were important, and could have influenced the jury in determining the amount of damages to be awarded. There was no reason for appellants to suspect that an evaluation by a neurologist was necessary until after they received the report from Dr. Magie. There was no request for a continuance of the case and there was no reason why the granting of the motion would necessarily delay the disposition of the litigation, but the most important fact is that the suggestion for the further examination came, not from appellants, but from Dr. Magie, who stated that "this patient contains quite bizarre neurological findings that are difficult to evaluate, and suggest that Mrs. Brannon should be examined by a neurologist for a completion of diagnosis." Of course, there was no opportunity to take the deposition of Dr. Adametz, since appellants were not aware of the fact that he had made an examination.

We think there was an abuse of discretion in not granting this motion.

It is contended that there was no substantial evidence to justify the question of permanent injury being submitted to the jury. We disagree, but inasmuch as this judgment is being reversed, and the cause remanded for another trial, we see no need to discuss the point.

It is asserted that the judgment was excessive, and this point, of course, is no longer involved, and one other alleged error is presented, but it is not likely to again occur on a second trial.

For the error herein set out, the judgment is reversed, and the cause remanded.